In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00158-CV
______________________________


KATHERINE TRENOLONE, ET AL., Appellants
 
V.
 
COOK EXPLORATION COMPANY, INDIVIDUALLY AND d/b/a 
 PONDEROSA GATHERING L.L.C., Appellee


                                              

On Appeal from the 188th Judicial District Court
 Gregg County, Texas
Trial Court No. 98-1704-A


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N
            From an abandoned, subsurface, natural-gas pipeline under a residential development has
erupted a dispute over whether Cook Exploration Company and Ponderosa Gathering, L.L.C.
(collectively called "Cook") could rightfully transport gas through the pipeline under the homes and
over the objections of Katherine Trenolone and her neighbors and fellow plaintiffs (collectively
called "Homeowners"). From a summary judgment in favor of Cook, Homeowners appeal, asserting
that fact issues exist as to ownership of both the pipeline and the easement and as to the right to use
the pipeline. Cook asserts both that its lease entitles it to use the pipeline and also that the pipeline,
as abandoned personalty, became owned by Cook, the first to possess the pipeline after its
abandonment. We hold the summary judgment was improper because (1) fact issues exist as to
whether Cook, as gas lessee, has a right to use the easement, and—although (2) the pipeline is
conclusively personalty—(3) neither side conclusively proved ownership of it.
            To prevail on a motion for summary judgment, a movant must establish that there is no
genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c). Summary judgment for a defendant is proper when the defendant negates
at least one element of each of the plaintiff's theories of recovery or pleads and conclusively
establishes each element of an affirmative defense. Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910,
911 (Tex. 1997); Wornick Co. v. Casas, 856 S.W.2d 732, 733 (Tex. 1993). The movant has the
burden of showing that there is no genuine issue of material fact and that it is entitled to judgment
as a matter of law. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985).
            In reviewing a summary judgment, we accept all the nonmovant's proof as true and indulge
every reasonable inference in the nonmovant's favor. Martinez, 941 S.W.2d at 911. All doubts
about the existence of a genuine issue of a material fact must be resolved against the movant. 
Johnson County Sheriff's Posse, Inc. v. Endsley, 926 S.W.2d 284, 285 (Tex. 1996).
1.         Fact Issues Exist as to Whether Cook, as Gas Lessee, Has a Right to Use the Easement
            Homeowners contend the release of the pipeline right-of-way easement vested ownership of
the easement back into the owners of the real property; hence, absent a right-of-way easement, Cook
could not use the pipeline. Cook argues that it, as mineral lessee, has the right to make reasonable
use of both the surface and the subsurface of the property to give effect to its oil, gas, and mineral
lease, and that part of that reasonable use is the use of this pipeline.
            In 1983, C. P. and Edna Denson executed an oil, gas, and mineral lease to Cook Exploration
Company. In 1991, Eugene and Jo Ann Porter also executed an oil, gas, and mineral lease to Cook
Exploration Company. In 1992, the oil, gas, and mineral leases of Denson and Porter were pooled
and consolidated to form a single production unit known as the "Cook Exploration Company C.P.
Denson Gas Unit. No. 2." The consolidated lease covers the right-of-way property held by Trident
N.G.L., Inc.
            The mineral lease gives Cook the dominant estate. Ball v. Dillard, 602 S.W.2d 521, 523
(Tex. 1980). The holder of the dominant estate has the right to use the land, both surface and
subsurface, absent an express limitation, as is reasonably necessary to enjoy the terms of the lease
contract and to carry out the purposes and intentions of the parties. Id.; Brown v. Lundell, 344
S.W.2d 863, 865 (Tex. 1961).
            But whether the lease's grant of the dominant estate carries the right to use the particular
easement is a fact question.
Although the mineral estate is the dominant estate, the rights implied in favor of the
mineral estate are to be exercised with due regard for the rights of the surface owner. 
Getty [Oil Co. v. Jones, 470 S.W.2d 618], 621 [(Tex. 1971)]; General Crude Oil Co.
v. Aiken, 162 Tex. 104, 344 S.W.2d 668, 669 (1961); Gulf Production Co. v.
Continental Oil Co., 139 Tex. 183, 132 S.W.2d 553, 563 (1939).
 
The accommodation doctrine is based on this concept of "due regard." [Getty,
470 S.W.2d] at 622. The accommodation doctrine, also known as the "alternative
means" doctrine, was first articulated in Getty as a means to balance the rights of the
surface owner and the mineral owner in the use of the surface:
 
Where there is an existing use by the surface owner which would
otherwise be precluded or impaired, and where under established
practices in the industry there are alternatives available to the lessee
whereby minerals can be recovered, the rules of reasonable usage of
the surface may require the adoption of an alternative by the lessee.
[Footnote omitted.]
 
Getty, 470 S.W.2d at 622. This right of accommodation between the surface and
mineral estates is dependent upon the state of the evidence and the findings of the
trier of the facts. Id. at 623. In Getty, the surface owner's "most advantageous, and
perhaps the only reasonable means of developing the surface for agricultural
purposes" was the rolling irrigation system that was blocked by Getty's pumpjacks. 
Id. at 622. Getty had available either submerged pumps in concrete cellars or
surface-mounted hydraulic pumps that were no taller than the irrigation system,
which this court held to be "reasonable alternatives to its present use of the surface." 
Id. (emphasis added).
 
The burden of proof to show that the use of the surface by the lessee is not
reasonably necessary is upon the surface owner. Id. This may be proven by showing
that the lessee's use of the surface is not reasonably necessary because of
non-interfering and reasonable ways and means of producing the minerals that are
available, the use of which will permit the surface owner to continue the existing use
of the surface. Id.

Tarrant County Water Control & Improvement Dist. Number One v. Haupt, Inc., 854 S.W.2d 909,
911 (Tex. 1993). Fact questions exist. Therefore, further proceedings are required to resolve the fact
question whether Cook, as gas lessee, has a right to use the easement in question.

2.         The Pipeline Is Conclusively Personalty
            Homeowners argue that the pipeline is real property and not personal property; hence, the
"finders keepers law" does not apply and the abandoned pipeline reverted to the owners of the
surrounding real property. Whether property embedded in the soil is realty or remains personal
property is a fact question. Logan v. Mullis, 686 S.W.2d 605, 608 (Tex. 1985). It is the intent of the
party placing the property that is critical in determining the character of the property. Id.; Sonnier
v. Chisholm-Ryder Co., Inc., 909 S.W.2d 475, 479 (Tex. 1995).
            To determine if personal property has become part of the realty, three factors are relevant:
(1) the mode and sufficiency of annexation, either real or constructive; (2) the
adaptation of the article to the use or purpose of the realty; and (3) the intention of
the party who annexed the chattel to the realty. The third criterion dealing with
intention is preeminent, whereas the first and second criteria constitute evidence of
intention.
 
Intent is made apparent by objective manifestations. As a general rule, intent is a
question of fact to be decided by the jury. However, even testimony of intention that
the chattel was not meant to become a fixture will not prevail in the face of
undisputed evidence to the contrary. Where reasonable minds cannot differ, the issue
is one of law rather than one of fact.
 
Mullis, 686 S.W.2d at 607 (citations omitted). Homeowners argue the testimony of Jim Hawkins,
Trident's plant superintendent, demonstrates Trident's clear intent for homeowners to become the
owners of the pipeline, thus making the pipeline part of the land. Trident's intent is not relevant here.
            A thirty-six inch diameter, 390 mile long, pipeline carrying natural gas was deemed not a part
of the realty. See Lingleville Indep. Sch. Dist. v. Valero Transmission Co., 763 S.W.2d 616 (Tex.
App.—Eastland 1989, writ denied). That resulted because the pipeline installer expressly retained
its right to remove the pipeline and the agreement provided that "Valero would have a right to access
to and from the right-of-way in order to construct, inspect, repair, maintain, replace, or remove
Valero's property." Id. at 618 (emphasis added).
            An agreement may evidence the intention of the contracting parties that the improvements
placed on the realty would not become a part of the land and thus not the property of the landowner. 
Id. Here, in 1961 Cities Services acquired a right-of-way easement to construct, repair, and
maintain a gas transportation pipeline under what became the residential neighborhood of
Homeowners. The right-of-way easement provided:
This right-of-way agreement may be assigned by GRANTEE, its successors and
assigns, in whole or in part, vesting in any other person, firm or corporation any or
all rights granted hereby, including the ownership of any facilities in place, together
with full rights of ingress and egress for the maintenance, repair, operation,
replacement and removal thereof.
 
(Emphasis added). The written easement between Cities Services and the landowners expressed the
intent of the parties that the pipeline would not become a permanent accession to the freehold. As
per the agreement, Trident—successor in interest to Cities Services—even removed portions of its
pipeline and capped the rest. 
            The pipeline was also not an accessory to the enjoyment of the freehold. It was adapted just
for the transmission of gas, accessory to the business of Cities Services and for its sole purpose. On
similar facts, the Texas Supreme Court found that property installed on realty remained personalty.
[The railroad] parts were merely accessory for its business, and were put on the land
for  this  purpose,  and  not  as  accessories  to  the  land  over  which  the  road  was
to pass . . . . [Thus,] the spur track involved in this controversy was not at any time,
and never became, a permanent fixture and a part of the realty . . . .
 
Tex. & New Orleans R.R. Co. v. Schoenfeld, 136 Tex. 173, 178, 146 S.W.2d 724 (1941). Cities
Services' intent to keep the pipeline personalty is apparent from the evidence. Homeowners did not
submit any contrary evidence of Cities Services' intent. In light of the undisputed evidence, the
pipeline is personal property.
3.         Neither Side Conclusively Proved Ownership of the Pipeline
A. Homeowners Did Not Conclusively Prove Their Ownership
            Homeowners contend that, by virtue of Trident's intentions when it released its right of way,
August 12, 1993, the pipeline is now owned by Homeowners, not Cook. As part of their argument,
Homeowners claim Trident released the easement "to the property owners," but the release names
no recipient or beneficiary of the release. Homeowners also assert that the legal effect of the release
is to vest the easement in the surface owners, citing Shaw v. Williams, 332 S.W.2d 797, 800 (Tex.
Civ. App.—Eastland 1960, writ ref'd n.r.e.). Shaw involved an easement for access to, and rights
to pump water from, a lake. The appellate court held that, once the easement holder released the
easement, it reverted to the landowner. True, the court examined intent, but it focused on the intent
of the parties to the deed which created the rights in question and, from that intent, determined the
deed created an easement—which, once abandoned, reverted to the landowner—not a determinable
fee simple as was claimed by one of the parties. Id. In Shaw, the intent of the party abandoning the
easement was not important. Likewise, here, the intent of the parties to the original pipeline
agreement is important, not Trident's intent. We conclude, on the authority of Shaw, that the
easement, when released, reverted to the associated landowners, possibly subject to reasonable use
by the holder of the dominant estate, dependent on a fact issue.
            But that does not answer the question about the ownership and right to use the pipeline itself. 
Given that it is personalty, its ownership does not necessarily follow ownership of the easement. See
Pearson v. Black, 120 S.W.2d 1075, 1079 (Tex. Civ. App.—Eastland 1938, no writ) (discussed
below). Homeowners did not conclusively prove ownership of the pipeline.
 
 
B. Cook Did Not Conclusively Prove Its Ownership
            Cook claims ownership of the pipeline through its use of the abandoned personal property. 
Title to abandoned personal property vests in the first person lawfully reducing it to possession. 
Black, 120 S.W.2d at 1079. In general, abandonment means "the relinquishment of the possession
of a thing by the owner with the intention of terminating his ownership, but without vesting it in any
one else." Id. "Abandoned personalty is no man's property until reduced to possession with intent
to acquire title." Gregg v. Caldwell-Guadalupe Pick-Up Stations, 286 S.W. 1083, 1084 (Tex.
Comm'n App. 1926, holding approved).
            In 1911, Black entered into an oil and gas lease with Texas Company. Black, 120 S.W. 2d
at 1077. Link Oil Corporation ("LOC"), the successor in interest to Texas Company, drilled a well
on the property, placed on it a quantity of drilling equipment and well casings, built a rig, and
discovered gas. Id. The well continued to produce gas until about January 1, 1932, at which time
LOC abandoned it. Id. Pearson entered on the land and removed 3,027 feet of casing. Id. at 1078. 
The court ruled that the casing, as personalty, did not revert to the landowners upon abandonment:
Assuming, as said before, that title to the oil, gas, coal and other minerals granted by
the instrument and being a freehold estate in land--a determinable fee estate--could
be lost or extinguished by simple abandonment, and that the title would as a
consequence revest in the former owners of the land, it does not follow, in our
opinion, that title to the casing would by abandonment ipso facto vest in such former
owners  of  the  land.  Under  the  lease,  such  personal  property  was  not  a  part
of the land . . . . There was a contract right to remove such personal property at will
which would not have been affected by an abandonment of the lease . . . . We know
of no rule or principle of law to the effect that abandoned personal property becomes
the property of him upon whose land it happens to be left.
 
Id. at 1079. The court held in favor of Pearson, based on the evidence that Pearson was the first to
take an actual possession of the casings once abandoned. See id. Similarly, the pipeline here is
personalty; hence, on abandonment the pipeline did not automatically revest in the former or current
owners of the land.
            The facts of the case at hand do not, in our opinion, satisfy the requirement of Black to vest
the interest in Cook. We understand Black to mean that, to ripen title to personalty, a person must
reduce it to lawful possession after the property has been abandoned. To read Black otherwise is
contrary to its language and would reward one who, at least initially, was a converter—or at least an
unauthorized possessor—of personalty before it had been abandoned. The evidence suggests at least
the possibility that Cook possessed the pipeline before it had been abandoned, but exactly when it
was abandoned appears to be a fact issue.
            Certainly on August 12, 1993, Trident formally released the right-of-way easement and
abandoned the pipeline. By this time, however, Cook was already using the pipeline to transport gas
from Denson No. 2 well. It is not disputed that Cook began using the pipeline in 1991 and continued
using it after August 12, 1993, the date it was officially abandoned. This is in contrast to the facts
of Black, in which Pearson and Jensen carried away the well casing only after its abandonment.
            Here, if the pipeline was abandoned only in 1993 and not before, Cook took possession of
unabandoned personal property contrary to the expressed wishes of its owner. Yet there is evidence
suggesting the pipeline may have been informally abandoned before Cook started using it in 1991. 
That is a fact question. Therefore, further proceedings are required in the trial court to determine
whether the evidence shows the pipeline's abandonment before Cook began its use.
            We reverse the judgment and remand this cause for further proceedings in accordance with
this opinion.



                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          January 20, 2005
Date Decided:             June 16, 2005



than a few days old,
were of the type that almost never occur in cases of oral sex or fondling, and were most
likely the result of penile penetration. Id. at 684. The doctor further testified the tears were
consistent with the account the complainant told to her. Id.
          Defense counsel sought permission to question the complainant regarding
statements she had made to her cousin to the effect that she had sexual intercourse with
an individual named Timmy. Id. at 685. During the trial court's in camera investigation, the
complainant denied having had sex with Timmy, but admitted she had told her cousin
otherwise. Id. After the trial court elicited the complainant's statement that she had lied
to her cousin and that the appellant was the only person with whom she had had
intercourse at the time of her examination, the trial court determined the evidence would
be more prejudicial than probative and disallowed any questioning on the issue of past
sexual conduct with Timmy. Id. Defense counsel then made a bill of exceptions containing
the testimony from two of the complainant's cousins that the complainant had had sexual
intercourse with Timmy. Id.
          The First Court of Appeals relied on the rationale in Reynolds and Hood to conclude
that the excluded evidence did fall within the category of evidence that would "explain or
rebut" the state's medical evidence. Tex. R. Evid. 412(b)(2)(A); Miles, 61 S.W.3d at 686. 
The court noted the cousins' testimony would likely be inadmissible hearsay falling within
the Burks


 holding. Miles, 61 S.W.3d at 687. The complainant's own testimony would not
be inadmissible hearsay, however. So, the court went on to weigh the probative value of
such evidence against its prejudicial effect. Id. Pointing to the complainant's admission
that she lied to her cousin about having had sex with Timmy, the court concluded the jury
should have had the right to weigh the complainant's credibility against that of Miles. For
this reason, the court held the trial court abused its discretion by determining the evidence
was more prejudicial than probative. Id.
                    2.       Excluded Testimony Does Not Rebut or Explain Medical Evidence
          Without evidence regarding when these alleged sexual encounters occurred, we
cannot conclude this excluded evidence explained the State's medical evidence. Unlike
the letter in Reynolds in which the complainant described several years of sexual abuse
by another man, Lampkins' testimony fails to explain or rebut the State's medical evidence. 
We note A.C. denied having had this conversation with Lampkins, thereby distinguishing
this case from Miles, in which the complainant admitted having made the statement
regarding prior sexual activity. Even taking this testimony as true, we still cannot determine
whether the alleged thirty-three partners may have been had after the examination
revealing the injuries to A.C.'s hymen, in which case, the evidence would be of no value. 
By contrast, in Reynolds, the letter is authored by the complainant herself and offers a
more concrete time line with which to gauge whether the testimony actually explains the
state's evidence. Here, we do not have such information. The trial court did not abuse its
discretion by excluding this evidence. 
                     3.       Excluded Evidence Constitutes Inadmissible Hearsay
          The Waco court addressed a similar issue concerning Rule 412 with a different
approach in Burks, 40 S.W.3d 698. In defense of allegations of sexual assault and
indecency with a child, the defendant sought to admit a note by the complainant that
described a prior sexual encounter with a person other than the defendant. Id. at 699. The
court held that the note was inadmissible hearsay and that Rule 412 could not be used as
a vehicle to gain admission of otherwise inadmissible evidence. Id. at 701. We agree and
conclude Kennedy cannot use Rule 412 to get otherwise inadmissible hearsay before the
jury. Even if the trial court had been incorrect in its application of Rule 412, we would
uphold its ruling on this alternate theory. See Romero v. State, 800 S.W.2d 539, 543 (Tex.
Crim. App. 1990).
          D.       Testimony Regarding Alleged Sexual Activity Between A.C. and C.M.
          In the in camera investigation, Lampkins testified to the following: "And then I got
home and I asked her about it, and she said, well, he never raped me -- the first time, she
said, he never raped me; he came in and caught me in the bed with [C.M.], and he made
[C.M.] leave." Later, outside the presence of the jury, Lampkins initially testified Kennedy
did see A.C. and C.M. having sex. A short time later, she clarified, testifying that Kennedy
"caught [C.M.] pulling up his pants." Kennedy contends the exclusion of this testimony was
error.
          Kennedy also complains of the trial court's exclusion of Kennedy's own version of
events on this matter. While the trial court allowed Kennedy to testify to the alleged threat
A.C. made to him as retaliation against his disciplinary measures, the trial court disallowed
any reference to Kennedy allegedly catching A.C. and C.M. in some kind of sexual activity. 
Rather, he testified A.C. threatened "to tell everyone that I had been messing with her"
because Kennedy intended to inform A.C.'s mother about a disciplinary problem. 

                    1.       No Offer of Proof as to What Kennedy's Testimony Would Have                                 Been

          While we can determine the general nature of the excluded testimony from the
preliminary discussions among the attorneys and the trial court, the record does not
contain an offer of proof from which we can analyze the excluded testimony in detail. 
Kennedy may have testified that he caught A.C. and C.M. having sex. Or he may have
testified, as did Lampkins, that he only saw C.M. pull his pants up. To preserve for review
a ruling on evidence, the record must contain a timely, specific objection and, if the ruling
excludes evidence, an offer of proof.


 See Tex. R. Evid. 103(a); Tex. R. App. P. 33.1(a). 
Simply put, we cannot determine the issue; any error in excluding this testimony was not
preserved for our review. We therefore will limit further analysis to the exclusion of
Lampkins' testimony regarding the incident.
                     2.       Probably Not Evidence of Victim's Past Sexual Behavior
          First, because Lampkins' testimony consists of speculation that A.C. and C.M.
engaged in some sort of sexual activity, we question whether this evidence qualifies as a
specific instance of "past sexual behavior" of A.C. as contemplated by Rule 412. Beyond
that, it is difficult to conclude that such speculative evidence rebuts or explains the State's
medical evidence. On its face, evidence C.M. was pulling up his pants does not
necessarily explain the tears in A.C.'s hymen. The excluded testimony here resembles the
testimony at issue in Rankin in which "witnesses made only vague references to the
complainant's alleged sexual activity." Rankin v. State, 821 S.W.2d 230, 233 (Tex.
App.—Houston [14th Dist.] 1991, no pet.). 
                    3.       Evidence More Prejudicial Than Probative
          Even taking this evidence at its most damaging, we still conclude that the prejudicial
effect of the evidence outweighs the probative value it would lend. The implication of
Lampkins' testimony might shed some light on a motive to fabricate allegations against
Kennedy, but only minimally more so than did Kennedy's own testimony regarding the
threat without reference to sexual activity. The excluded testimony would add only the
element of speculated past sexual activity with C.M., i.e., the jury got to hear Kennedy's
testimony regarding the alleged threat A.C. issued to him in response to disciplinary action
against her. Therefore, any probative value of the excluded testimony concerning
suspected sexual activity between A.C. and C.M. is very limited; its main effect would be
prejudicial by intimating at past sexual activity of A.C. The trial court did not abuse its
discretion by excluding the testimony suggesting past sexual activity between A.C. and
C.M.


 We overrule Kennedy's contention.
III.      Exclusion of Hearsay Evidence
          A.       Testimony from Lampkins Concerning "Get[ting] Stories Straight" 
          Kennedy also complains the trial court abused its discretion by excluding evidence
from Lampkins that A.C. encouraged her friends to "get [their] stories straight." Outside
the presence of the jury, Lampkins testified A.C. told Lampkins and two other friends
"that[,] in case we all had to testify at court[,] that we all needed to have the same story." 
Lampkins continued, testifying A.C. "told us our stories had to be that when he walked in,
after he made that guy leave, that he started touching her. She never said that they had
sexual intercourse. She just said that he touched her, that's it. That's what she told me." 
Lampkins explained A.C. then "told us that we were going to have to say that he touched
her so she wouldn't get in trouble." Lampkins repeated much of this testimony during the
trial court's in camera investigation regarding related evidence. Testimony to this effect,
Kennedy argues, is admissible as a statement against interest and, as such, an exception
to the rule excluding hearsay. See Tex. R. Evid. 803(24). 
          B.       Statement Against Interest Exception to Hearsay
          The Rules of Evidence provide that a statement against interest falls outside the rule
excluding hearsay and defines a statement against interest as:
A statement which was at the time of its making so far contrary to the
declarant's pecuniary or proprietary interest, or so far tended to subject the
declarant to civil or criminal liability, or to render invalid a claim by the
declarant against another, or to make the declarant an object of hatred,
ridicule, or disgrace, that a reasonable person in declarant's position would
not have made the statement unless believing it to be true. In criminal
cases, a statement tending to expose the declarant to criminal liability is not
admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.

Tex. R. Evid. 803(24). On appeal, Kennedy limits his analysis to that portion of Rule
803(24) dealing with a statement against penal interest.


 The State, likewise, limits its
response to only that aspect of Rule 803(24) and correctly notes that any determination
regarding the admissibility of a statement against penal interest in accordance with Rule
803(24) requires a two-step inquiry. See Woods v. State, 152 S.W.3d 105, 113 (Tex. Crim.
App. 2004), cert. denied, ___ U.S. ___, 125 S.Ct 2295 (2005). First, the trial court must
determine whether the statement in question tends to expose the declarant to criminal
liability. Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). Second, the trial
court must determine if there are corroborating circumstances that clearly indicate the
trustworthiness of the statement. Id. 
          Whether a statement is, in fact, a statement against interest under Rule 803(24)
must be determined from the circumstances of each case. Drone v. State, 906 S.W.2d
608, 612 (Tex. App.—Austin 1995, pet. ref'd). We review a trial court's decision to admit
or exclude a hearsay statement under Rule 803(24) for an abuse of discretion. See
Bingham, 987 S.W.2d at 57. 
          C.       Statement Against Penal Interest Not Applicable
          After reviewing A.C.'s alleged statements, we conclude the record does not
demonstrate that the statements would expose A.C. to criminal liability in the manner
contemplated by Rule 803(24). Here, Kennedy argues that A.C.'s admission to her friends
she had been lying is perjury and subordination of perjury: "Perjury subjects the declarant
to criminal liabilities and is therefore a statement against her interest." The offense of
perjury, however, as described by the Penal Code, requires that the statement at issue be
made under oath. See Tex. Pen. Code Ann. § 37.02(a)(1) (Vernon 2003). Here, the
statement is one A.C. allegedly made to her friends at one of their homes. The context of
these statements clearly indicates they were not made under oath. Of course, A.C.'s
testimony regarding the abuse was made under oath. However, this is not the statement
sought to be admitted and, thus, cannot be the focus of our analysis. The statement at
issue—the one allegedly made to A.C.'s friends—does not subject A.C. to criminal liability
for perjury. The statement against penal interest exception, therefore, is inapplicable. 
          Additionally, we find nothing in the record in the way of corroborating circumstances
as plainly required by Rule 803(24). Kennedy points to his own testimony about finding
A.C. in bed with a boy and the accompanying threats to accuse him as circumstances that
corroborate the excluded testimony. We note this is previously excluded testimony rather
than corroborating circumstances. We have found no authority that would permit
consideration of such testimony as qualifying corroborating circumstances under Rule
803(24). Thus, even if the first prong of the statement against penal interest exception
were somehow satisfied here, Kennedy's argument would still fail because of the absence
of corroborating circumstances. As presented to us on appeal, the trial court's exclusion
of Lampkins' testimony as a statement against penal interest was not an abuse of
discretion. We overrule Kennedy's third point of error.
 

IV.      Conclusion
          Having overruled all of Kennedy's contentions regarding the trial court's exclusion
of testimony under Tex. R. Evid. 412 and 803(24), we affirm the trial court's judgment.


                                                                           Donald R. Ross
                                                                           Justice


DISSENTING OPINION
          Kennedy offered evidence from Raschella Lampkins that the complaining witness
told her and two other friends that they needed to have the same story, that they were
going to have to say Kennedy touched A.C. so A.C. would not get in trouble, and that A.C.
told them what their stories had to be concerning Kennedy touching her. The majority
affirms the exclusion of this evidence, to which I dissent.
          The majority opinion reaches its conclusion because "Kennedy limits his analysis
to that portion of Rule 803(24) dealing with a statement against penal interest." Therefore,
the majority does not analyze whether this evidence was admissible based on other
portions of Tex. R. Evid. 803(24).
          I believe the evidence was admissible as provided by Rule 803(24) as a statement
against the declarant's social interest and as a statement invalidating a claim by the
witness. This issue was clearly presented to the trial court—the evidence was offered by
Kennedy, the State objected, based on hearsay, and Kennedy countered that the evidence
was admissible as a statement against interest as set out in Tex. R. Evid. 803(24). I
believe the issue has been sufficiently briefed in this Court. In the brief submitted to this
Court, Kennedy presents an issue that the trial court erred by not admitting evidence under
Rule 803(24). In the summary of the argument, Kennedy states the court erred in finding
that the testimony did not fall under the exception to hearsay for a statement against
interest under Rule 803(24). Kennedy argues on appeal that such denial was error and
the evidence should have been allowed to be presented to the jury. In the argument
section of the brief, Kennedy repeats the issue and quotes in its entirety Texas Rule of
Evidence 803(24). Kennedy then cites a case as authority, Robinson v. Harkins & Co., 711
S.W.2d 619, 621 (Tex. 1986), which involves a statement embodying all three interests
expressed in the rule (pecuniary, penal, and social). I believe that Kennedy has complied
with the rule so that this issue is properly before the Court and should be addressed. 
Texas Rule of Appellate Procedure 38(h) requires that the brief contain a clear and concise
argument for the contentions made, with appropriate citations to authorities and to the
record. Tex. R. App. P. 38(h). Here, the contention made is that the statement is an
exception to the hearsay rule by virtue of the exceptions set out in Rule 803(24). The rule
in its entirety is quoted as the authority, and a citation is given to a case and to the record. 
The briefing rules found in the Texas Rules of Appellate Procedure "are meant to acquaint
the court with the issues in a case and to present argument that will enable the court to
decide the case." Tex. R. App. P. 38.9. The rules are to be construed liberally, and
substantial compliance with the rules is sufficient unless the court determines the rules
have been flagrantly violated (in which case the court may require further briefing), or that
the case has not been properly presented, or that the law and authorities have not been
properly cited (in which case the court may postpone submission, require additional
briefing, or make any other necessary order for a satisfactory submission of the case). 
Tex. R. App. P. 38.9. Kennedy's brief does not violate Rule 38.9 and substantially complies
with the Texas Rules of Appellate Procedure.


 Therefore, I will analyze the issues fairly
raised in Kennedy's brief. 
I.        EXCLUSION OF HEARSAY EVIDENCE
A.Testimony from Lampkins Concerning "Get[ting] Stories Straight" 
          Kennedy complains the trial court abused its discretion by excluding evidence from
Lampkins that A.C. encouraged her friends to "get [their] stories straight." Outside the
presence of the jury, Lampkins testified A.C. told Lampkins and two other friends "that[,]
in case we all had to testify at court[,] that we all needed to have the same story." 
Lampkins continued, testifying A.C. "told us our stories had to be that when he walked in,
after he made that guy leave, that he started touching her. She never said that they had
sexual intercourse. She just said that he touched her, that's it. That's what she told me." 
Lampkins explained A.C. then "told us that we were going to have to say that he touched
her so she wouldn't get in trouble." Lampkins repeated much of this testimony during the
trial court's in camera investigation regarding related evidence. Testimony to this effect,
Kennedy argues, is admissible as a statement against interest and, as such, an exception
to the rule excluding hearsay. See Tex. R. Evid. 803(24). 
          B.       Statement Against Interest Exception to Hearsay
          The Texas Rules of Evidence provide that a statement against interest falls outside
the rule excluding hearsay and defines a statement against interest as:
A statement which was at the time of its making so far contrary to the
declarant's pecuniary or proprietary interest, or so far tended to subject the
declarant to civil or criminal liability, or to render invalid a claim by the
declarant against another, or to make the declarant an object of hatred,
ridicule, or disgrace, that a reasonable person in declarant's position would
not have made the statement unless believing it to be true. In criminal
cases, a statement tending to expose the declarant to criminal liability is not
admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.

Tex. R. Evid. 803(24). The State limits its response to only one aspect of Rule 803(24) by
pointing to the rule that any determination regarding the admissibility of a statement against
penal interest in accordance with Rule 803(24) requires a two-step inquiry. See Woods
v. State, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004), cert. denied, ___ U.S. ___, 125
S.Ct. 2295 (2005). However, Rule 803(24) requires much more analysis than just whether
a statement is one against the declarant's penal interest. 
          Whether a statement is, in fact, a statement against interest under Rule 803(24)
must be determined from the circumstances of each case. Drone v. State, 906 S.W.2d
608, 612 (Tex. App.—Austin 1995, pet. ref'd). We review a trial court's decision to admit
or exclude a hearsay statement under Rule 803(24) for an abuse of discretion. See
Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999).
          1.       Invalidating a Claim by Declarant
          Initially, the language involving the invalidation of the declarant's claim against
another seems to address the statement excluded here. Although no Texas caselaw has
developed the application of the language "render invalid a claim by the declarant against
another" in these circumstances, we note that the alleged statement, if believed by the jury,
would tend to invalidate A.C.'s claim of abuse. So, while there is no authority delineating
the boundaries of this aspect of Rule 803(24), I conclude that Lampkins's testimony would
be admissible in that A.C.'s statement would have rendered A.C.'s claim against Kennedy
invalid. 
          2.       Statement Against Social Interest
          To be admitted on the basis it would subject the declarant to disgrace, the statement
must be "in the context of the declarant's social interests" and must be against such
interests "at the time it was made." Burks v. State, 40 S.W.3d 698, 701 (Tex. App.—Waco
2001, pet. ref'd) (citing Owens v. State, 916 S.W.2d 713, 718 (Tex. App.—Waco 1996, no
pet.); Bell v. State, 877 S.W.2d 21, 24 n.2 (Tex. App.—Dallas 1994, pet. ref'd)). 
          There appears to be a rather narrow application of Rule 803(24)'s statement against
the "social interest" exception. See Sills v. State, 846 S.W.2d 392, 397 (Tex.
App.—Houston [14th Dist.] 1992, pet. ref'd). Sills describes the types of facts which would
give rise to the application of this facet of Rule 803(24):
To be admissible, a statement against interest that makes the declarant the
object of hatred, ridicule, or disgrace must be in the context of the declarant's
social interests, such as a confession by a small-town minister of
homosexual conduct, Purtell v. State, 761 S.W.2d 360, 369 (Tex. Crim. App.
1988), . . . or a statement by a husband that he was responsible for an
automobile accident whereby his wife became a paraplegic. Robinson v.
Harkins & Co., 711 S.W.2d 619, 621 (Tex. 1986). 

Sills, 846 S.W.2d at 397 (some citations omitted); see also Franklin v. State, 992 S.W.2d
698, 706 (Tex. App.—Texarkana 1999, pet. ref'd).
          A type of statement that qualifies as a statement against social interest is presented
when an appellant convicted of sexual assault of a child complained of the trial court's
admission of hearsay statements in which the fourteen-year-old complainant confessed
to her mother to having had sexual relations with the twenty-six-year-old appellant. See
Glover v. State, 102 S.W.3d 754, 766 (Tex. App.—Texarkana 2002, pet. ref'd). She made
the statements reluctantly and only did so when confronted by the possibility that her
mother already "knew everything," subjecting the complainant to punishment if she were
to be untruthful. Id. This Court reasoned that "a reasonable person in [the complainant]'s
position would have known that her statements would subject her to disgrace in the eyes
of her mother." Id. Therefore, the trial court did not abuse its discretion by admitting the
hearsay statements. 
          To illustrate what evidence does not qualify as a statement against social interest,
the Waco court's opinion in Burks should be considered. There, the complainant's note
to her friend boasting about a sexual encounter with a boy was not admissible in an
indecency and sexual assault of a child case. Burks, 40 S.W.3d at 701. The note did not
qualify as a statement against social interest because it was not of a nature that would
have subjected the declarant/complainant to "hatred, ridicule, or disgrace, that a
reasonable person in declarant's position would not have made the statement unless
believing it to be true." Id. 
          Here, on the other hand, evidence that A.C. attempted to influence her friends to
testify Kennedy touched her, so she would not get in trouble, runs directly against A.C.'s
social interests. Her family, friends, and community would likely treat her with varying
degrees and types of hostility, distrust, and resentment if it were revealed that she had lied
about the abuse. Common sense and social norms suggest A.C. would have been subject
to "disgrace, ridicule, or hatred" for having falsely accused a family friend of sexual assault. 
So the statement more closely resembles those deemed admissible in Glover and Purtell
than it does the inadmissible statement in Burks. 
          Outside the presence of the jury, A.C. denied ever having made this statement. 
Likewise, other friends of A.C. testified outside the presence of the jury that A.C. did not
make such a statement regarding "get[ting] [their] stories straight." So, there is a conflict
in the evidence. Such conflicts and related issues concerning credibility of witnesses fall
squarely within the traditional purview of the jury. See Lester v. State, 120 S.W.3d 897,
902 (Tex. App.—Texarkana 2003, no pet.). The initial determination of trustworthiness is
an issue of law, while the ultimate weight to be given to the testimony will be decided by
the jury.


 I believe the court erred in excluding the testimony of Lampkins on this subject. 
II.       Harm Analysis
          Where, as here, erroneous exclusion of evidence is the result of misapplication of
the Texas Rules of Evidence and its admission is not claimed to be required by the United
States or Texas Constitutions, we analyze harm under Texas Rule of Evidence 103(a),
which provides that error may not be predicated on a ruling that admits or excludes
evidence unless a "substantial right" of the party is affected. Tex. R. Evid. 103(a); Potier
v. State, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002). The standard is the same as that
under Rule 44.2(b). Tex. R. App. P. 44.2(b); Potier, 68 S.W.3d at 666. A substantial right
is affected when the error had a substantial and injurious effect or influence on the jury's
verdict. Johnson v. State, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001); Lester, 120 S.W.3d at
903. A criminal conviction should not be overturned for nonconstitutional error if the
appellate court, after examining the record as a whole, has a fair assurance the error did
not influence the jury, or had but a slight effect. See Tex. R. App. P. 44.2(b); Johnson v.
State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (citing King v. State, 953 S.W.2d 266
(Tex. Crim. App. 1997)).
          The excluded evidence, if believed by the jury, would seriously call into question the
testimony of the complaining witness. A.C. was the primary witness to testify as to the guilt
of Kennedy and, unless her testimony was believed, there was no direct evidence of
Kennedy's guilt. The excluded testimony went to the heart of the case—the credibility and
believability of the only witness who testified Kennedy committed sexual assault. The
excluded testimony attacked the credibility of the witness on the most important issue in
the case, not some collateral matter or some detail of little importance. I cannot say with
fair assurance that the erroneous exclusion of these statements of the complaining witness
did not affect Kennedy's substantial rights. 
          Under these circumstances, I believe we must reverse the case for further
proceedings. I respectfully dissent.
 
                                                                           Jack Carter
                                                                           Justice

Date Submitted:      July 26, 2005
Date Decided:         December 7, 2005

Publish